J-S42030-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CARNELL FRAZIER | : | No. 2532 EDA 2019 |

Appeal from the PCRA Order Entered August 12, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0011395-2012


BEFORE:  PANELLA, P.J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY OLSON, J.:                    **FILED NOVEMBER 16, 2020**

The Commonwealth of Pennsylvania appeals from the order entered on August 12, 2019, which granted Carnell Frazier ("Defendant") relief, in the form of a new trial, under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.  We vacate and remand.

Defendant was arrested on June 12, 2012; the Commonwealth subsequently charged him with persons not to possess firearms, possession of a firearm with an altered manufacturer's number, carrying firearms in public in Philadelphia, possessing instruments of crime ("PIC"), recklessly endangering another person ("REAP"), simple assault, and resisting arrest.[1]

Defendant's jury trial began on February 26, 2014.  Yolanda Williams testified first for the Commonwealth.  Ms. Williams testified that, on June 12,

---

[1] 18 Pa.C.S.A.  §§ 6105(a)(1), 6110.2, 6108, 907(a), 2705, 2701(a), and 5104, respectively.

2012, she was sitting outside of a Philadelphia house, which was located at 2454 Douglas Street, and talking with her niece, Sharee Thomas. Ms. Williams testified that, as she was sitting outside of the house, a neighbor came by and informed her niece that an argument was occurring inside of the nearby house, located at 2437 Douglas Street. N.T. Trial, 2/26/14, at 7-9. Defendant and Defendant's wife, Kimberly Frazier, lived in the 2437 Douglas Street house. *Id.* at 10.

Ms. Williams testified that she and her niece walked down the street and went inside of Defendant's house to investigate. *Id.* at 11-13. When they entered the house, she stayed in the first-floor entryway while her niece attempted to mediate the verbal argument between Defendant and Mrs. Frazier on the second-floor of the house. *Id.* at 14-15. After about five or ten minutes, Defendant came down the stairs, loudly saying, in an aggressive tone, "who's in my damn house, everybody mind their damn business. . . . Get the fuck out my house and mind your business." *Id.* at 17 and 19. Ms. Williams testified that Defendant then "went into the kitchen and went on the top of the cabinet and grabbed a gun." *Id.* at 17-18. She stated that the gun "was a MAC-10" and, after Defendant grabbed the gun, Defendant walked "toward us [and] . . . point[ed the gun] at everybody . . . [and said] get the fuck out of his house." *Id.* at 20-21 and 24. Ms. Williams testified that she immediately "ran out [of] the door" and ran into a neighbor's house. *Id.* at 20 and 25.

As Ms. Williams testified, from her vantage point inside of the neighbor's house, she watched Defendant walk outside of his house with the gun in his hand and begin "just pointing the gun [at people on the street] asking if anybody got anything to say." *Id.* at 26-27. Ms. Williams testified that, at this point, the people on the street ran into their houses. *Id.* at 26-28.

According to Ms. Williams, she backed away from the window because she was fearful that Defendant would begin firing the gun. *Id.* at 28. However, when Ms. Williams began looking outside again, she saw Defendant walking "towards York Street." *Id.*

Ms. Williams testified that she did not call the police upon Defendant. *Id.* at 44-45. However, the police arrived on scene approximately five or ten minutes after she entered the neighbor's house and, when the police arrived, Ms. Williams left the neighbor's house and went outside. *Id.* at 29. When she was outside, she looked around and saw Defendant "at the corner at the playground . . . coming back up Douglas Street," without the gun. *Id.* at 29-30 and 55. She then saw the police approach Defendant. Upon approach, Defendant threw punches at the police, swore at them, and spit in one of their faces. *Id.* at 30-31.

Ms. Williams further testified that, after she gave her statement to the police, Defendant's wife, Kimberly Frazier, called her and offered her money if she would not testify in court. *Id.* at 41.

The Commonwealth next presented the testimony of Philadelphia Police Officer Ross Scott. Officer Scott testified that, on June 12, 2012, he was

on-duty and driving a marked patrol car when he and his partner received a "radio call for a black male with a gray sweatshirt, blue sweat pants, on the highway . . . [in] the area of 2400 Douglas Street . . . with a MAC-10." *Id.* at 63. Officer Scott testified that, when he turned onto Douglas Street, he "noticed a man matching the flash, gray sweatshirt and blue sweat pants," and Officer Scott also noticed that "people on the block [were] pointing at" the man in the gray sweatshirt and blue sweat pants, who was later identified as Defendant. *Id.* at 66. As Officer Scott testified:

> I got out of the car weapons drawn, I asked [Defendant] to place his hands up against the wall. He complied at that moment. The moment that I holstered my weapon, he tried to take off on me and I grabbed his wrist and told him put his hands against the wall. He said he [did not] have to put his hands against the wall[. At this] point . . . we don't know if he got a weapon. He got into a defensive stance. . . . He swings for my head. I ducked his swing, ducked his [closed] fist, my partner tackles him against the red step. He punch[ed] him in his face and his knees [gave] out and I [tried] to cuff him. . . . [We] frisked him and made sure he didn't have a weapon on him. . . . [He did not] have a weapon on him.
>
> . . .
>
> We tried to put him [in] the police car, he [was] fighting the whole way, he won't get in the car. He spit in my partner's face and once he's almost in the car after struggling with him, he tries to kiss my partner and [said], I'm going to make you my bitch.

*Id.* at 69-72.

The Commonwealth also presented the testimony of Philadelphia Police Sergeant Gregory Caputo. As Sergeant Caputo testified, on June 12, 2012,

he "received a radio call . . . for a person with a gun on the 2400 block of Douglas Street[. Specifically,] for a black male in a gray sweatshirt, walking down the street with a gun in his hand." *Id.* at 99. Indeed, Sergeant Caputo testified that, after the first call, the police "received one call after that which led to a third call which led to a fourth call." *Id.*

Sergeant Caputo testified that he arrived at the corner of York and Douglas Streets, exited his vehicle, and was approached by two females, who told him that "the male your officers stopped down there threw a gun in the lot by the alleyway right there." *Id.* at 100-101. He testified:

> [A] K-9 was called, K-9 officer arrived. [He] and his dog began to search the alleyway. As soon as he began to search the alleyway there was one trash can that was chained to this half moon circle monkey bars, a piece of [] playground equipment here, there was some trash bags in it.
>
> As he was searching the alleyway, I lifted the one trash bag out of it and there was a black handgun. If I can refer to my notes, it was a black Cobray M11 semi-automatic, [nine-millimeter] gun [lying] inside of the trash can. It was loaded with 18 rounds, ten hollow point, eight full metal jacket, one was in the chamber, 17 rounds were in the extended magazine.
>
> . . .
>
> We immediately recovered [the gun] at that point due to the weather. It started to . . . rain that day. Normally, at the time when we recover a firearm, we would hold it for prints. We were trying to get a DNA trace and try to compare DNA comparison to a suspect, but with any weather conditions it's difficult and basically impossible to get prints or DNA off of a weapon with rain out of the trash can.
>
> So we immediately recovered it and it was handed over to the detectives in my presence.

- 5 -

*Id.* at 104-106.

Sergeant Caputo testified that, when he recovered the gun, he discovered that "the serial number [on the gun] was partially obliterated or scratched off so the full serial number was not able to be identified or recorded." *Id.* at 107.

The Commonwealth presented the recovered firearm to Yolanda Williams in court and Ms. Williams testified that the firearm was the same "gun [Defendant] pointed at [her]" on the day in question. *Id.* at 24.

The Commonwealth next presented Philadelphia Police Officer Raymond Andrejczik as an expert in the area of firearms identification and analysis. *Id.* at 115. Officer Andrejczik testified that the recovered firearm was a Cobray M11. He testified that the firearm was operational and that the serial number on the firearm "had been removed . . . by abrasion." *Id.* at 120-121. Further, regarding Ms. Williams' identification of the weapon as a "MAC-10," Officer Andrejczik testified:

> Technically . . . it [would] be incorrect to identify that weapon as a MAC-10[.] . . . [B]ut generally speaking the MAC-10 is similar in design. It's a little bit shorter [and] it's a little bit fatter and a little bit higher. It looks the same, it's a shrunken version, it's fatter. They were made by the same companies and it was made in different calibers, it was made in [nine-millimeter] and .45 auto. So for someone to look at something and say it's a MAC-10 or any other variation of that gun, they really wouldn't be wrong. It would be a wrong identification, but it wouldn't be a specification, a general specification of a type of firearm.

*Id.* at 123.

After the Commonwealth rested its case, Defendant presented the testimony of his wife, Kimberly Frazier. *Id.* at 149. Mrs. Frazier testified that, on the day in question:

> Me and [Defendant] and my mom and sister[, Brittany Yancy,] were having a verbal altercation. We had the verbal altercation, we were all upstairs in the front bedroom. Our door was unlocked because my mom and sister had just came to our home.
>
> We heard somebody come into the house. So everybody stopped what they were doing, we all proceeded down the steps. [Defendant] was the first person down the steps and all of us was right behind him. Me and [Defendant], who was in the house, he did cuss them out. He was asking who the fuck was in the house, get out, mind your business. We were arguing, but it wasn't that loud for anybody to enter the home. So we all proceeded outside and were trying to get [Defendant] to get back in the house. We were all in front of my house arguing.
>
> . . .
>
> Yolanda Williams . . . [,] she goes right down the street to her mother-in-law's house, still arguing and commotion going on. I'm telling [Defendant] to come back into the house. I didn't want our business in the street. Everybody – it was a million people outside.
>
> Somebody called the cops, the cops came. [Defendant] was, I want to say maybe four doors down to the right of our home. He never went down the street, he never did anything. We remained on the front of the home.

*Id.* at 150-152.

Mrs. Frazier testified that Defendant did not grab a gun that day and that, to her knowledge, there were never any guns in their house. *Id.* at 154. Mrs. Frazier also testified that she never offered Yolanda Williams money in

- 7 -

exchange for not testifying in this case. Indeed, Mrs. Frazier testified that Ms. Williams demanded that the Fraziers pay her for not testifying. *Id.* at 158. Finally, we note that the Commonwealth cross-examined Mrs. Frazier as to whether she had a motive to lie, in order to protect her husband. Specifically, the Commonwealth asked Mrs. Frazier: "So that brings me to an important point, you obviously don't want anything bad to happen to [Defendant], like going away and not being able to support you financially, correct?" *Id.* at 204. Although she claimed to be financially secure, Mrs. Frazier responded "why would I want anything bad to happen to him, that's my husband? He's the father of all three of my children …". *Id.* at 204-205.

The jury found Defendant guilty of carrying firearms in public in Philadelphia, PIC, REAP, simple assault, resisting arrest, and possession of a firearm with an altered manufacturer's number. N.T. Trial, 3/4/14, at 5-6. Moreover, following a bench trial, the trial court found Defendant guilty of persons not to possess firearms. *Id.* at 13-14.

On April 21, 2014, the trial court sentenced Defendant to an aggregate term of ten to 20 years in prison, followed by five years of probation, for his convictions. N.T. Sentencing, 4/21/14, at 13-15. We affirmed Defendant's judgment of sentence on February 24, 2016 and the Pennsylvania Supreme Court denied his petition for allowance of appeal on July 19, 2016. **Commonwealth v. Frazier**, 141 A.3d 602 (Pa. Super. 2016) (unpublished memorandum) at 1-4, *appeal denied*, 145 A.3d 162 (Pa. 2016).

On June 12, 2017, Defendant filed a timely, *pro se* PCRA petition. The PCRA court appointed counsel to represent Defendant during the proceedings and counsel filed an amended petition on Defendant's behalf. Within the amended petition, Defendant claimed that his trial counsel, Patrick Link, Esquire (hereinafter "Trial Counsel"), was ineffective for failing to present the testimony of Defendant's sister-in-law, Brittany Yancey. According to Defendant, Ms. Yancey was inside of his house at all relevant times and, if called as a witness during trial, Ms. Yancey would have testified that Defendant did not possess a firearm during the June 12, 2012 incident. Amended PCRA Petition, 3/19/18, at 3.

During the PCRA hearing, Defendant testified that, before trial, he instructed Trial Counsel to speak with Ms. Yancey. N.T. PCRA Hearing, 4/29/19, at 7. At the time Defendant spoke with Trial Counsel about Ms. Yancey, Ms. Yancey was serving in the United States Army and living in Colorado. *Id.* at 25. Defendant testified that he informed Trial Counsel that Ms. Yancey "was there at the scene . . . [and] she would be able to say that [Defendant] didn't have a firearm." *Id.* at 8. Further, Defendant testified that he told Trial Counsel that Ms. Yancey "was in the military and she needed to be subpoenaed." *Id.* According to Defendant, Trial Counsel told him that "being as though [Ms. Yancey is] in the military, he didn't have to call [her]." *Id.*

Defendant also called Trial Counsel as a witness during the PCRA hearing. Trial Counsel testified that he no longer possessed Defendant's trial

file and he "[didn't] really know where [the trial file] is." N.T. PCRA Hearing, 4/1/19, at 7. Although Trial Counsel testified that he did not remember much about Defendant's case, Trial Counsel testified that he was "sure [Defendant] would have mentioned" Ms. Yancey to him prior to the trial. N.T. PCRA Hearing, 4/29/19, at 17. Trial Counsel also testified that, generally speaking, "[i]f a witness [were] not [located] in Philadelphia, but crucial to the case, [he] would [] ask[] for a [trial] continuance" to call the witness at trial. *Id.*

Finally, Defendant called Brittany Yancey as a witness. Ms. Yancey testified that, on June 12, 2012, she was visiting Defendant and she witnessed the verbal argument between Defendant and Defendant's wife. *Id.* at 22. Ms. Yancey testified that, when Yolanda Williams entered Defendant's home, Defendant walked down the stairs and Ms. Williams left the house. *Id.* at 23. Ms. Yancey testified that Defendant never picked up or possessed a gun during the interaction. *Id.* at 29.

As Ms. Yancey testified, approximately two months after Defendant's arrest, she joined the United States Army and left Philadelphia for basic training. *Id.* at 23-24. Ms. Yancey testified that, at the time of Defendant's trial, she was living in Fort Carson, Colorado and she was "willing to come back and testify for [Defendant]" at Defendant's trial, however, "[n]o one ever contacted me or said that I needed to come back." *Id.* at 24-25. Further, Ms. Yancey testified that, since she was in the Army, she could not simply leave Fort Carson and come back to Philadelphia at will. Rather, she testified: "[I needed to have been] made aware [that] . . . I was going to be needed to

testify . . . and with that, I would have been able to go down [(*sic*)] my chain of command and get leave and fly back. But without notice, I had a duty at that point in time to serve, and I can't just up and go." ***Id.*** at 37.

On August 12, 2019, the PCRA court granted Defendant relief on his ineffective assistance of counsel claim. As the PCRA court explained to the parties in court:

> I believe [Ms. Yancey's] testimony would have certainly been relevant and could have swayed the jury. One person doesn't have to say [Defendant] doesn't have a gun; maybe that doesn't sway them. But if two people said [Defendant] doesn't have a gun, maybe that does.
>
> [Trial Counsel] testified that he stated that [Ms. Yancey] was in the military, so that he didn't believe that they could call her. . . .
>
> I believe that Brittany Yancey was a credible witness at the evidentiary hearing. And that her testimony would have been relevant. And that it was ineffective for counsel to have failed to contact her to come in for trial.

N.T. PCRA Hearing, 8/12/19, at 3-4.

Further, within the PCRA court's Rule 1925(a) opinion, the PCRA court explained that it granted Defendant relief on his ineffective assistance of counsel claim because:

> the issue of whether or not [Defendant] had a gun on [the day in question] was the central issue to be decided by the jury, who was tasked with weighing testimony from two diametrically opposed witnesses. [Brittany] Yancey's testimony would [have] most certainly been relevant to this inquiry and helpful to the defense. The Commonwealth's position, that her testimony would merely have been cumulative, is erroneous. Ms. Yancey, a member of the U.S. Armed Services, would have bolstered the defense with her

- 11 -

testimony. Although there is no [] crystal ball, and perhaps the jury would have found [Defendant] guilty in any event, it is certainly conceivable that Ms. Yancey's testimony could have exonerated [Defendant].

. . .

Based on the [] testimony at trial and at the evidentiary hearing, [Defendant] has met his burden insofar as (1) Ms. Yancey existed; (2) she would have been available to testify for the defense had she received a subpoena; (3) [] counsel knew or should have known of her existence; and (4) [] she was willing to testify for the defense.

The final inquiry, therefore, is whether Brittany Yancey's absence was so prejudicial as to have denied [Defendant] a fair trial. There was no forensic evidence, therefore [Defendant] was convicted on the strength of the direct evidence provided by Yolanda Williams, as well as the circumstantial evidence surrounding the recovery of the weapon. Ms. Williams admittedly had a prior conviction for drug dealing. Brittany Yancey, on the other hand, was a member of the U.S. Armed Forces. Her contradictory testimony concerning whether [Defendant] had a gun could have carried more weight with a factfinder. In the absence of forensic evidence, sum and substance of evidence submitted for the jury's consideration was the conflicting testimony of two [] eye witnesses, and the recovery of a [firearm] in the nearby trashcan. Brittany Yancey's testimony at the evidentiary hearing was clear and unequivocal. There is nothing in the record that would suggest that Ms. Yancey would not have testified similarly at trial. Had she done so, it is certainly possible that [Defendant] would have been exonerated. Therefore, the absence of her testimony was so prejudicial as to undermine the truth-seeking process.

Trial Court Opinion, 1/31/20, at 12-13.

The Commonwealth filed a timely notice of appeal and now raises the following claim to this Court:

- 12 -

> Did the PCRA court commit reversible error by granting post-conviction relief on [Defendant's] claim that counsel was ineffective for not calling his sister-in-law as a witness, where the court . . . disregarded that the proffered testimony was merely cumulative of the testimony of another witness who testified at trial, ignored the totality of the record which demonstrated that the presence of the proffered cumulative testimony would not have altered the outcome at trial[, and] . . . improperly diminished [Defendant's] burden to prove prejudice[?]

Commonwealth's Brief at 4.[2]

"Under the applicable standard of review, we must determine whether the ruling of the PCRA court is supported by the record and is free of legal error." **Commonwealth v. Spotz**, 18 A.3d 244, 259 (Pa. 2011). "The PCRA court's credibility determinations, when supported by the record, are binding on this Court. However, this Court applies a *de novo* standard of review to the PCRA court's legal conclusions." **Id.** (citations omitted).

To be eligible for relief under the PCRA, the petitioner must plead and prove by a preponderance of the evidence that his conviction or sentence resulted from "one or more" of the seven, specifically enumerated

---

[2] The PCRA court ordered the Commonwealth to file and serve a concise statement of errors complained of on appeal, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). The Commonwealth complied and raised the following claim in its Rule 1925(b) statement:

> Whether the PCRA court erred in granting a new trial based on ineffective assistance of counsel for not calling a witness, where the proposed testimony was cumulative of testimony presented at trial and [Defendant] was not prejudiced[?]

Commonwealth's Rule 1925(b) Statement, 11/12/19, at 1.

circumstances listed in 42 Pa.C.S.A. § 9543(a)(2). One of these statutorily enumerated circumstances is the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii).

Counsel is presumed to be effective and "the burden of demonstrating ineffectiveness rests on [the petitioner]." *Commonwealth v. Rivera*, 10 A.3d 1276, 1279 (Pa. Super. 2010). To satisfy this burden, the petitioner must plead and prove by a preponderance of the evidence that:

> (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and, (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceedings would have been different.

*Commonwealth v. Fulton*, 830 A.2d 567, 572 (Pa. 2003). As this Court has explained:

> A claim has arguable merit where the factual averments, if accurate, could establish cause for relief. *See Commonwealth v. Jones*, 876 A.2d 380, 385 (Pa. 2005) ("if a petitioner raises allegations, which, even if accepted as true, do not establish the underlying claim . . . , he or she will have failed to establish the arguable merit prong related to the claim"). Whether the facts rise to the level of arguable merit is a legal determination.
>
> The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not employ a

- 14 -

> hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.
>
> Prejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Commonwealth v. Stewart*, 84 A.3d 701, 707 (Pa. Super. 2013) (some quotations and citations omitted). "A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim." *Id.*

Within his PCRA petition, Defendant claimed that Trial Counsel was ineffective for failing to call Brittany Yancey as a witness. Our Supreme Court has explained:

> In order to prevail on a claim of ineffectiveness for failing to call a witness, a [petitioner] must [plead and] prove, in addition to . . . the three [general ineffective assistance of counsel] requirements [listed above], that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew or should have known of the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the witness's testimony was so prejudicial as to have denied [the petitioner] a fair trial.

*Commonwealth v. Wright*, 961 A.2d 119, 155 (Pa. 2008). "[T]rial counsel will not be found ineffective for failing to call a witness whose testimony would be cumulative." *Commonwealth v. Gibson*, 951 A.2d 1110, 1134 (Pa. 2008); *see also Commonwealth v. Milligan*, 693 A.2d 1313, 1319 (Pa. Super. 1997) ("[a]s a general rule, counsel will not be deemed ineffective for

failing to call witnesses whose testimony is merely cumulative of that of other witnesses").

The Commonwealth claims that the PCRA court erred in granting Defendant relief on his ineffective assistance of counsel claim because: (1) Brittany Yancey's proposed trial testimony was merely cumulative of Kimberly Frazier's testimony; (2) Brittany Yancey's proposed trial testimony "would not have altered the outcome at trial;" and, (3) the PCRA court "improperly diminished [Defendant's] burden to prove prejudice." Commonwealth's Brief at 4. We conclude that Brittany Yancey's proposed testimony was not "merely cumulative" of Kimberly Frazier's testimony, but that the PCRA court abused its discretion when it concluded Ms. Yancey's proposed testimony would have altered the outcome at trial. We thus vacate the PCRA court's order and remand.[3]

First, the Commonwealth argues that the PCRA court erred in granting Defendant relief on his petition because Brittany Yancey's proposed trial testimony was merely cumulative of Kimberly Frazier's trial testimony. This claim fails.

In **Commonwealth v. Small**, the Pennsylvania Supreme Court explained the historical derivation and the proper definition of the term

---

[3] Given our disposition, we do not reach the Commonwealth's claim that the PCRA court "improperly diminished [Defendant's] burden to prove prejudice." **See** Commonwealth's Brief at 4.

"merely cumulative evidence," in the context of an after-discovered evidence claim. We quote, at length, from the Supreme Court's explanation:

> In [**Commonwealth v. Flanagan**, 7 Watts & Serg. 415 (Pa. 1844),] the [Pennsylvania Supreme] Court expounded on the law set forth two and a half decades earlier in [**Moore v. Philadelphia Bank**, 5 Serg. & Rawle 41 (Pa. 1819]], articulating for the first time an additional requirement that after-discovered evidence — in order to support a request for relief — must be more than "merely" cumulative of other evidence presented at trial. To that end, [the **Flanagan** Court] stated: "So cumulative evidence, by which is meant additional evidence to support the same point, or where it is of the same character as evidence already produced, is not sufficient to induce the court to grant a new trial." [**Flanagan**, 7 Watts & Serg. at 423].
>
> . . .
>
> Aside from a passing remark in **Flanagan** regarding this "same point, same character" framework, [the Supreme] Court has done little more to explicate the meaning of the term.
>
> Turning to other jurisdictions for guidance, it is apparent that . . . many states have adopted some version of the "same point, same character" analysis for determining whether newly discovered evidence is merely cumulative, and thus not sufficient to support a new trial. . . .
>
> Our analysis of these concepts is enhanced by consideration of case law from the Supreme Court of Georgia:
>
>> [T]he true test as to whether evidence is cumulative depends not only on whether it tends to establish the same fact, but it may depend on whether the new evidence is of the same or different grade. It is only when newly discovered evidence either relates to a particular material issue concerning which no witness has previously testified, or is of a higher and different grade from that previously had on the same material point, that it will

- 17 -

ordinarily be taken outside the definition of cumulative evidence.

*Brown v. State*, 450 S.E.2d 821, 824 (Ga. 1994) (citation omitted).

We view the definitions of cumulative evidence employed by our sister states to be consistent with our decision in *Flanagan*, and we reaffirm that after-discovered evidence is merely corroborative or cumulative — and thus not sufficient to support the grant of a new trial — if it is of the same character and to the same material point as evidence already adduced at trial. It is clear the terms "of the same character" and "to the same point" refer to distinct qualities of evidence; to be "merely corroborative or cumulative," newly discovered evidence must tend to prove material facts that were already in evidence at trial, and also be of the same grade or character of evidence as that produced at the trial to prove those material facts. If the new evidence is of a different and "higher" grade or character, though upon the same point, or of the same grade or character on a different point, it is not "merely" corroborative or cumulative, and may support the grant of a new trial based on after-discovered evidence.

This definition of merely corroborative or cumulative evidence accounts for the reality that not all evidence relating to the same material point is equal in quality, or "grade." *See generally Commonwealth v. Dennis*, 950 A.2d 945, 963 n.14 (Pa. 2008) ("Where the defense is one of mistaken identity, and the only alibi witness [the defendant] presents is his father, it seems plain that the addition of an unrelated alibi witness whose testimony corroborates other testimony tending to exculpate [the defendant] is not 'merely cumulative[.]'")

*Commonwealth v. Small*, 189 A.3d 961, 973-974 (Pa. 2018).

At the outset, we note that *Small* defined what is "merely cumulative" evidence in the context of an after-discovered evidence claim. Our case differs from *Small*, in that we are required to determine whether certain evidence is "merely cumulative" in the context of an ineffective assistance of counsel for

- 18 -

failure to call a witness claim.  Nevertheless, **Small**'s definition of the term "merely cumulative" is equally applicable in the context of this case.  To be sure, in either context, the issue of whether evidence is "merely cumulative" depends upon "the material point" to which the evidence is relevant and the "character" of the evidence.  In other words, the differing context does not change the fundamental nature of the term "merely cumulative" evidence.  Thus, in either context, the **Small** Court's definition of the term "merely cumulative" is binding.

Here, on the issue of whether Defendant possessed a gun on June 12, 2012, Brittany Yancey's PCRA hearing testimony was substantially similar to Mrs. Frazier's trial testimony:  both Brittany Yancey and Kimberly Frazier testified that they witnessed the entire event and that Defendant did not possess a gun on the day in question.  Therefore, Brittany Yancey's proposed testimony is "upon the same point" as Mrs. Frazier's trial testimony.  However, this does not end our inquiry, as the **Small** Court held that, even if new evidence is "upon the same point," the evidence is not cumulative if it "is of a different and 'higher' grade or character."  **Id.** at 974.

Kimberly Frazier is Defendant's wife and, as the Commonwealth emphasized during trial, she has a motive to lie because she "obviously [doesn't] want anything bad to happen to [her husband], like going away and not being able to support [her] financially."  N.T. Trial, 2/26/14, at 204.  Moreover, Mrs. Frazier was impeached at trial with evidence that she

attempted to bribe the Commonwealth's main witness – Yolanda Williams – with money if Ms. Williams refused to testify. *Id.* at 41.

Contrariwise, Brittany Yancey is Defendant's sister-in-law and, thus, familially speaking, is not as close to Defendant as Kimberly Frazier. There is no evidence that Ms. Yancey depends upon Defendant for financial or childrearing support. There is also no evidence that Ms. Yancey attempted to bribe a witness. Finally, and crucially, the PCRA court specifically concluded that Brittany Yancey's PCRA hearing testimony was credible. *See* N.T. PCRA Hearing, 8/12/19, at 3-4 (the PCRA court declared: "I believe that Brittany Yancey was a credible witness at the evidentiary hearing"). We are bound by this credibility determination. *Commonwealth v. Abu-Jamal*, 720 A.2d 79, 99 (Pa. 1998) ("[j]ust as with any other credibility determination, where the record supports the PCRA court's credibility determinations, those determinations are binding on this court").

Given these facts, we conclude that the PCRA court did not abuse its discretion when it concluded that Brittany Yancey's proposed testimony was not cumulative of Kimberly Frazier's trial testimony. Simply stated, given the PCRA court's credibility determination in favor of Ms. Yancey and the impeachment evidence proffered against Mrs. Frazier at trial, we conclude that the PCRA court was within its discretion to conclude that Ms. Yancey's proposed testimony was not cumulative, as it was of a higher grade or

character than Mrs. Frazier's trial testimony.[4]  The Commonwealth's claim to the contrary fails.

Next, the Commonwealth claims that the PCRA court erred in granting Defendant relief, as Brittany Yancey's proposed trial testimony "would not have altered the outcome at trial."  Commonwealth's Brief at 4.  Essentially, the Commonwealth claims, the evidence that Defendant possessed a firearm on the day in question was overwhelming and, thus, Defendant failed to prove that the absence of Ms. Yancey's testimony caused him prejudice.  *See id*. at 24.  We agree with the Commonwealth.

It is true that, in this case, there was no DNA or fingerprint evidence connecting Defendant to the gun; the serial number on the gun was obliterated and there was no paperwork linking Defendant to the gun; and, Defendant's wife, Kimberly Frazier testified that Defendant did not have a gun on the day in question.  Nevertheless, the testimonial, circumstantial, and direct evidence overwhelmingly proved that Defendant possessed a firearm on the day in question.

First, the Commonwealth presented Yolanda Williams, who testified that Defendant brandished "a MAC-10" in his house and on the street.  N.T. Trial,

---

[4] Within the Commonwealth's brief, the Commonwealth also claims that the PCRA court erred in granting Defendant relief because Trial Counsel "made a strategic decision not to call [Brittany Yancey because Ms. Yancey was a] cumulative witness[]."  Commonwealth's Brief at 23.  The Commonwealth did not include this claim in its Rule 1925(b) statement.  Therefore, this claim is waived.  *See* Pa.R.A.P. 1925(b)(4)(vii) ("[i]ssues not included in the [Rule 1925(b)] Statement . . . are waived").

2/26/14, at 17-18. Ms. Williams also testified that she did not call the police upon Defendant. *Id.* at 44-45. Moreover, she testified that, after the police arrived at the scene on the day in question, she left her place of hiding and saw Defendant "at the corner at the playground . . . coming back up Douglas Street," without a gun. *Id.* at 29-30 and 55.

Police Officer Ross Scott testified that he received a "radio call for a black male with a gray sweatshirt, blue sweat pants, on the highway . . . [in] the area of 2400 Douglas Street . . . with a MAC-10." *Id.* at 63. Officer Scott testified that, when he arrived on Douglas Street, he "noticed a man matching the flash, gray sweatshirt and blue sweat pants," and Officer Scott observed "people on the block pointing at" the man, who was later identified as Defendant. *Id.* at 66. Given that Ms. Williams testified that she did not call the police, a fair inference from Officer Scott's testimony is that, whomever called the police also reported that Defendant possessed "a MAC-10."

Next, Sergeant Gregory Caputo testified that the police received four separate telephone calls of "a black male in a gray sweatshirt, walking down the street with a gun in his hand." *Id.* at 99. Sergeant Caputo further testified that, when he arrived at the scene, he was approached by two unidentified females, who told him that Defendant "threw a gun in the lot by the alleyway right there." *Id.* at 100-101. This "lot" was the same lot that Yolanda Williams testified she saw Defendant walking away from, without the gun, minutes after the incident. *Id.* at 29-30 and 55. Sergeant Caputo then testified that he

searched the lot and found a Cobray M11 semi-automatic, nine-millimeter gun inside of a trash can in the lot. *Id.* at 104-106.

Officer Raymond Andrejczik testified that the MAC-10 and Cobray M11 "look[] the same," are "similar in design," and are of the same general type of firearm. *Id.* at 123. In addition, Yolanda Williams testified, in court, that the gun Sergeant Caputo found was the same "gun [Defendant] pointed at [her]" on the day in question. *Id.* at 24.

Finally, multiple witnesses testified that Defendant resisted arrest on the day in question. *See id.* at 69-72.

With respect to an ineffective assistance of counsel claim, "[p]rejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Stewart*, 84 A.3d at 707 (some quotations and citations omitted); *Strickland v. Washington*, 466 U.S. 668, 694 (1984) ("[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome"). In this case, the evidence that Defendant possessed a firearm on the day in question was overwhelming. To summarize, this evidence includes: multiple, independent witnesses and calls to the police, which placed a firearm in Defendant's hands and at least one caller identified the gun as a MAC-10; Yolanda Williams' testimony that Defendant possessed a "MAC-10;" Sergeant

Caputo's testimony that he was told, by two females, that Defendant threw a firearm in "the lot by the alleyway;" Sergeant Caputo's testimony that, when he searched the lot, he discovered a Cobray M11 in a garbage can on the lot; Officer Andrejczik's testimony that the MAC-10 and Cobray M11 "look[] the same," are "similar in design," and are of the same general type of firearm; Yolanda Williams' testimony that the recovered firearm was the same firearm that Defendant pointed at her; and, Defendant's attempts to resist arrest. ***See***, ***e.g.***, ***Commonwealth v. Pestinikas***, 617 A.2d 1339, 1347-1348 (Pa. Super. 1992) ("It is well settled that when a person has committed a crime, and knows that he is wanted for it, any attempt by that person . . . to escape from custody or resist arrest . . . or to otherwise engage in conduct designed to avoid apprehension or prosecution for such crime may be admissible as evidence of consciousness of guilt, and may, along with other evidence in the case, form a basis from which guilt may be inferred").

Given this overwhelming evidence, we conclude that the PCRA court abused its discretion in determining that the absence of Brittany Yancey's trial testimony "undermine[d the] confidence in the outcome" of Defendant's trial. In other words, even if Brittany Yancey testified at Defendant's trial, there is no "reasonable probability that . . . the result of the proceeding would have been different." The PCRA court's decision to the contrary is, respectfully, an abuse of discretion and we thus vacate the PCRA court's order.

Order vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/16/20